López Feliciano, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
La recurrente Puerto Rican Insurance Agency, Inc., en adelante PRIA, nos solicita que revisemos una resolución de la Oficina del Comisionado de Seguros de Puerto Rico, en adelante OCS, en el caso número E-2000-386, la cual fue dictada el 30 de abril de 2004, notificada y archivada en autos el 3 de mayo siguiente. Mediante dicha resolución, la OCS ordenó a PRIA tomar las medidas necesarias para corregir ciertas *866 deficiencias que le fueron señaladas como resultado de un examen de sus operaciones para el período comprendido entre el 1ro. de octubre de 1994 y el 31 de diciembre de 2000. Además de las medidas correctivas requeridas, la OCS impuso a PRIA una multa administrativa de $21,275.00 por infracciones a ciertas normas y reglas aplicables al asunto adjudicado.
Presentada ante este foro la solicitud de revisión judicial, el 20 de octubre de 2004 ordenamos a la OCS expresar su posición en cuanto al recurso instado. Oportunamente, la OCS presentó un escrito de oposición de la revisión administrativa solicitada.
Luego de un minucioso estudio y análisis de los escritos de ambas partes, así como del expediente administrativo sometido a nuestra consideración, estamos en posición de disponer del recurso, lo que a continuación hacemos.
I
Los Hechos e Incidentes Procesales Pertinentes
PRIA es un corredor de seguros de líneas excedentes autorizado para actuar como tal por la OCS.
En marzo de 2001, la OCS informó a PRIA su propósito de evaluar su cumplimiento, como corredor de líneas excedentes, con las disposiciones del Capítulo 10 del Código de Seguros de Puerto Rico, la Regla XVIII del Reglamento del Código de Seguros y con la Carta Normativa E-N-12-1275-95 del 9 de enero de 1996. Las operaciones objeto de dicho examen cubrían el período del 1ro. de octubre de 1994 al 31 de diciembre de 2000.
A la conclusión del examen antes aludido, el 17 de agosto de 2001, la OCS notificó a PRIA copia del Informe de la Investigación realizada. El informe contenía ciertos hallazgos y conclusiones y fue notificado en cumplimiento con las disposiciones del Artículo 2.180 del Código de Seguros, 26 L.P.R.A. see. 218. Se le advirtió a PRIA de su derecho a presentar objeciones al mismo y a solicitar vista para considerar las objeciones dentro de un término de 20 días, contado a partir de la fecha de la notificación.
Mediante comunicación del 14 de septiembre de 2001, PRIA presentó por escrito a la OCS sus objeciones al informe de referencia. Dichas objeciones fueron las siguientes, según constan en el apéndice de la recurrente, págs. 33-35.

“1. Hállazso #1. página, 2 del Informe: Se nos señala que cumplimos con la Carta Normativa E-N-12-1275-95 del 9 de enero de 1996 y el Artículo 3 de la Regla XXVIII del Reglamento del Código de Seguros de Puerto Rico al notificar a la Oficina del Comisionado de Seguros el método a utilizar para la presentación del informe y el pago de contribución; sin embargo, el método notificado no es el que se está utilizando.

Aceptamos que esta situación ocurrió, aunque motivada por traslados que ocasionaron no se diera seguimiento al procedimiento notificado.

El método que se está utilizando actualmente, el cual es provisto por ley, se mantendrá en vigor hasta las renovaciones que comienzan en enero de 2002. Por este medio notificamos que de esa fecha en adelante, se procederá en la manera que fue notificado por la Sra. Eunice Betancourt en la carta mencionada en el informe y fechada el 15 de enero de 19997. La fianza de garantía financiera ya ha sido sometida a la Oficina del Comisionado de Seguros.

2. Hallazgo #4, página 4: Informe Anual de Primas y Pérdidas de Seguros de Líneas Excedentes para el año 1999. Nos ha extrañado mucho este señalamiento, pues estos informes siempre se han radicado, pero luego de una búsqueda en los expedientes de la compañía no hemos podido hallar copia de dicho informe sellada 
*867
por la Oficina del Comisionado de Seguros.

3. Hallazgo #5. vásina 4: Se alega que de varios riesgos sometidos al Centro de Circulación de la Oficina del Comisionado de Seguros, no se encontró evidencia de que estos fueran colocados en el mercado de líneas excedentes. Dicha evidencia no la tenemos, ya que al no emitirse póliza alguna, se eliminaban anualmente (Véase Anejo 1).

4. Hallazgo #6. vásina 4: Se acepta dicho hallazgo, pero se informa que ya se ha establecido el registro según dispone la Carta Normativa Número E-12-1275-95 del 9 de enero de 1996.

5. Hallazgo #8. vásina 6: Pago de contribución sobte primas de seguros de líneas excedentes: Se objeta dicho señalamiento, ya que el pago se realizó dentró de los sesehta (60) días contados a la fecha de confirmación de cubierta de dicho seguro, de conformidad al Artículo 10.130 del Código de Seguro de Puerto Rico y la Sección 204-1905(b) del Reglamento de Seguros. El anejo que se acompaña sólo contempla la fecha de vigencia de la póliza y no la alternativa que provee tanto el Código como su Reglamento.

Por tal razón, entendemos respetuosamente que debe eliminarse dicho señalamiento.

6. Hallazgo #9. página 6: Cobro de derrama en seguros de líneas excedentes: Se acepta dicho señalamiento, pero se aclara que en los tres casos se reembolsaron dichas sumas a los asegurados.

7. Hallazgo #10. página 7: Hemos solicitado de Ocaso Insurance la evidencia del pago al asegurado de la devolución de la prima no devengada para que puedan proceder con la devolución de la contribución a PR1A. Tan pronto la obtengamos, se la haremos llegar. Por tanto, objetamos la devolución al asegurado.

8. Hallazgo #11. página 8: En este señalamiento se nos indica que transcurrió más de un año antes de colocar la póliza luego de haber circulado el riesgo y se nos requiere no dejar transcurrir tanto tiempo para colocarlo una vez se circule el mismo, de conformidad a lo dispuesto en la Regla XXVIII del Reglamento del Código de Seguros y ala Carta Normativa Número E-12-1275-95 del 9 de enero de 1996.

Objetamos dicho señalamiento, ya que ni de la Regla XXVIII ni de la Carta Normativa anteriormente mencionada surge término específico para colocar un riesgo luego de que éste se haya circulado, la cantidad de veces que deba circularse el mismo, ni obligación alguna al respecto. Por tal razón, entendemos debe eliminarse dicho señalamiento.

9. Hallazgo #12. página 8: Radicación de formularios de Circulación de Riesgos incompleto: En los casos que ocurrió esta situación, los formularios fueron devueltos inmediatamente a la Oficina del Comisionado de Seguros enmendados. Se han tomado las medidas necesarias para que esto no vuelva a ocurrir. ”

Originalmente, la OCS señaló para el 13 de noviembre de 2001, una vista administrativa para considerar las objeciones de PRIA. La vista no se celebró en dicha fecha y las partes presentaron escritos en apoyo a sus respectivas posiciones.
Con fecha de 31 de octubre de 2001, las partes presentaron un “Informe de Conferencia entre las Partes” en el cual consignaron lo siguiente:

“Las partes han llegado a los siguientes acuerdos, los cuales se presentan en el mismo orden en que fueron presentadas las objeciones por Puerto Rican Insurance Agency, Inc.:

*868
A. Hallazgo #1

El Corredor lo acepta y notifica que el método que están utilizando y que es el provisto por ley lo mantendrán en vigor hasta renovaciones que comienzan en el 2002. De esa fecha en adelante se procederá de la manera que fue notificado por la Sra. Eunice Betancourt en la carta de 15 de enero de 1997.

B. Hallazgo #4

El Corredor indica que se preparó y radicó el informe, pero no ha podido encontrar copia sellada del mismo, por lo tanto procederán a preparar y radicarlo nuevamente.

C. Hallazgo #5

El Corredor argumenta que no tiene la evidencia porque no se emitió una póliza y que anualmente-se eliminan los modelos de circulación de riesgos.

D. Hallazgo #6

El Corredor lo acepta e Informa que ya se ha establecido el registro según requerido por la Carta Normativa E-I2-1275-95.

E. Hallazgo #7

El corredor acepta que cursó correspondencia, pero argumenta que ello no es colocar el riesgo, sino que envían una comunicación al asegurador para notificar que la póliza está por vencer y corroborar si está disponible aún.

F. Hallazgo #8

El Comisionado argumenta que la Carta Normativa E-12-1275-95 es clara en cuanto a que el período de los sesenta (60) días comenzará a contar a partir de la confirmación de cubierta o la vigencia de la póliza lo que ocurra primero. El Corredor alega, aunque está consciente de lo establecido en la Carta Normativa mencionada, en la práctica resulta casi imposible cumplir con dicha disposición porque en casos como éstos que son de renovación, la compañía expide la póliza retroactiva a la fecha de vencimiento de la póliza anterior.

G. Hallazgo #9

El Corredor lo acepta y evidenció que en los tres casos se devolvió el dinero.

H. Hallazgo #10

El Corredor argumenta que el pago le corresponde ú OCASO y no al asegurado. La posición del Comisionado es que la responsabilidad de cualquier prima cobrada por el corredor de líneas excedentes es directamente con el asegurado. El Corredor solicitó una explicación a OCASO con evidencia de la cantidad y la fecha de acreditación del ajuste para someterla a la Oficina del Comisionado de Seguros quien determinará a quién se le devolverá la contribución pagada a base la dicha prueba.

*869 /. Hallazgo #12

El Corredor lo acepta.”

Con fecha de 20 4e febrero de 2002, las partes sometieron un “Informe de Conferencia Complementario” en el cual hicieron constar lo siguiente:

“A continuación sometemos, la exposición aclaratoria requerida de .forma separada por cada parte. La exposición que cada parte somete es en explicación de los hechos estipulados y a fin de exponer el peso que al entender de las partes debe concederse a los hechos indicados. Por ende, solicitamos que se reciban las notas explicativas a continuación como argumentos de las partes y se consideren los hechos indicados en el Informe radicado como las estipulaciones de hechos acordadas.

Puerto Rican Insurance Aeencv. Inc.

1. Hallazgo #4: PRIA sostiene que el Informe fue preparado para el término del año 1999, pero no ha podido hallar la copia sellada que acredite la presentación del informe. En las circunstancias, propone preparar nuevamente el informe. Al presente, se ha requerido del Departamento de Contabilidad que facilite un listado de todo el negocio emitido para ese año, de modo que se pueda reconstruir la información precisada para completar el informe. Se indica esta información para que sea considerada como atenuante del hallazgo indicado.

2. Hallazgo #7: PRIA acepta como cuestión dé hecho que cursó correspondencia previa a la circulación de riesgo. Sin embargo, entiende que dichas comunicaciones no constituyen violación a la norma, ya que se justifican por la razón de ser de la comunicación y que como cuestión de hecho, no se ha colocado el riesgo previo a su circulación. Los riesgos son circulados para verificar si hay alguna compañía local que desee aceptar el riesgo. En la práctica de PRIA, ningún riesgo es colocado antes de que se circulen. La correspondencia cursada con el asegurador es a fin de meramente informar y advertir el vencimiento de la póliza, ya que de lo contrario, el asegurado se quedaría sin cubierta al no constar en los récords de la compañía local interesada en cubrir el riesgo. ¿Cómo sería posible circular el riesgo si se desconoce que la voluntad del asegurado es cubrir nuevamente el mismo? En síntesis, la posición de la compañía es que se acepta el hecho del envío de correspondencia para advertir el hecho del vencimiento de la póliza, pero se niega en derecho que la misma constituya una práctica de solicitación, de persuasión, ni mucho menos, negociación anterior al otorgamiento ni circulación del riesgo.

De entenderse que la comunicación de notificar el vencimiento es en violación a la Regla XXVIII, solicitamos que las razones prácticas que motivan la comunicación sobre vencimiento se consideren como atenuantes a la violación de la norma por estar dirigida a evitar el potencial de falta de cubierta para el asegurado y que no se vaya a circular el riesgo.

3. Hallazgo #10: PRIA coincide conque el pago corresponde al asegurado en este caso, ya al efecto de se le envía al productor que trae la cuenta para que sea éste quien se lo haga legar al cliente. PRIA solicitará nuevamente a la persona a cargo en el Departamento de Agencias Generales que indique nuevamente cómo OCASO, según indica, distribuyó la cantidad en otras pólizas que el asegurado tiene en PRAICO. Una vez la información sea aclarada, se someterá el asunto a la Oficina del Comisionado mediante carta para que el 9% de contribución pueda ser devuelto a PRIA. La posición de PRIA es que ha cumplido de todas formas al remitir el importe al asegurado por conducto del Agente y que al efecto, con la información que OCASO nos suministre, podremos confirmar que en efecto se ha devuelto la prima al asegurado.

*870
OFICINA DEL COMISIONADO DE SEGUROS:

1. En cuanto al hallazgo #4 el Corredor reconoce en sus objeciones que “luego de una búsqueda en los expedientes de la compañía no hemos podido hallar copia de dicho informe sellada por la Oficina del Comisionado de Seguros” por lo que es claro que el hallazgo fue aceptado, aunque el Corredor expresa en el informe de conferencia entre las partes que preparará y presentará el informe nuevamente. El señalamiento prevalece.

2. De otra parte, en cuanto al hallazgo #7, el Corredor no hizo comentario alguno en sus objeciones, por lo que entendemos que el mismo fue aceptado. Sin embargo, en el informe de conferencia entre las partes, el Corredor argumenta el mismo. La posición del Comisionado es que cursar correspondencia con un asegurador elegible de líneas excedentes antes de circular los riesgos, o antes de transcurrir el período de cinco (5) días, no cumple con lo establecido en el Código de Seguros y su Reglamento...”.

A pesar de que la OCS señaló para el 23 de julio de 2002 la vista administrativa en su fondo para disponer del caso, el 7 de agosto de 2002, las partes presentaron una “Moción Informativa de Manera Conjunta’’’ en la cual aclararon ciertas controversias pendientes. En particular, en dicha moción se abordó el hallazgo #7 del Informe de Investigación. En lo aquí pertinente en dicha moción, las partes estipularon lo siguiente:

"1....

2....

3. Que las partes de epígrafe se reunieron con el propósito de identificar las cartas en controversia. Durante la reunión, la representación legal del Comisionado de Seguros indicó que se había revisado la lista de casos en donde se imputa violación a las disposiciones de los Artículos 1 y 2 de la Regla XXVIII del Reglamento del Código. Durante la referida revisión, los representantes del Comisionado informaron que se iban a eliminar del Anejo II cuarenta y cinco (45) casos en los que se determinó que la primera comunicación fue cursada por el asegurador de líneas excedentes y no existe evidencia de que el Corredor contestara o cursara alguna correspondencia antes o durante el período de circulación del riesgo.

4. Las partes han acordado someter una muestra de cuatro (4) casos de los que el Comisionado eliminó del Anejo II, en donde ambas partes están de acuerdo en que no se ha violado la Regla XXVII y cinco (5) en que por haberse tramitado una cotización previo a o durante la circulación del riesgo, la Oficina del Comisionado de Seguros entiende que hubo violación a la Regla antes citada.

5. Los documentos que evidencian la tramitación de una cotización previo a o durante la circulación del riesgo son:

a. Carta del 3 de junio de 1998, para la póliza del Sr. Gerardo O. Torres — Comenzó la circulación de dicho riesgo el 5 de junio de 1998; aún no habían transcurrido los cinco (5) días desde la circulación.

b. Carta del 4 de marzo de 1999, para la póliza del asegurado Castillo Water Sports, Inc. - Comenzó la circulación el día 2 de marzo de 1999; no habían transcurrido los cinco (5) días de circulación.

c. Carta del 2 de septiembre de 1999, para la póliza del Sr. Raúl Roldán — Comenzó la circulación el 2 de septiembre de 1999; no habían transcurridos los (5) días de circulación.

d. Carta del 8 de noviembre de 1999, para la póliza del Sr. David LópezJCardiopulmonary - Comenzó la circulación el 3 de diciembre de 1999.

*871
e. Carta del 12 de mayo de 2000, para la póliza de Brains & Work, Inc. - Comenzó la circulación el 8 de mayo de 2000; no habían transcurrido los cinco (5) días de circulación.

6. Documentos que evidencian un trámite aceptable a la Oficina del Comisionado de Seguros son:

a. Documentos relacionados a la colocación de la póliza de Pérez & Mangual.

b. Documentos relacionados a la colocación de la póliza de Aurora Jiménez. .

c. Documentos relacionados a la colocación de la póliza de La Perla de Gran Precio.

d. Documentos relacionados a la colocación de la póliza de The Redemptorist Fathers of S.J.

7. La evidencia identificada bajo el párrafo cinco del presente escrito evidencia el trámite realizado por el corredor de líneas excedente, el cual la Oficina del Comisionado de Seguros sostiene que constituye parte del acto de colocación del riesgo previo a su circulación, y el corredor considera un trámite con anterioridad a la colocación del riesgo y que la colocación es cuando efectivamente se emite la cubierta. Ambas partes ya han presentado su argumentación escrita y oral ante la Honorable Oficial Examinadora en cuanto a lo que cada parte considera lo que constituye colocar el riesgo.

8. Que habiendo cumplido las partes con lo que le fuera requerido, solicitamos nuevamente que se de el caso por sometido para su adjudicación final.

9. Que siendo ello así, ambas partes entienden que resulta innecesaria la celebración de la vista administrativa evidenciaría previamente pautada.”

Así las cosas, el 30 de abril de 2004, con notificación a las partes el 3 de mayo siguiente, la OCS, por conducto de su oficial examinadora, dictó la resolución objeto del presente recurso de revisión. Los hechos concluidos en la misma son los siguientes:

“1. Puerto Rican Insurance Agency, Inc. es un corredor de seguros de líneas excedentes autorizado a actuar como tal por la Oficina del Comisionado de Seguros.

2. El Corredor notificó a la Oficina del Comisionado de Seguros, mediante carta de 15 de enero de 19997, que utilizaría el método que provee para la presentación de un informe conteniendo todos los seguros de líneas excedentes colocados durante el año calendario inmediatamente anterior a la fecha de presentación del informe, junto con el pago global de la contribución sobre primas de todas las pólizas correspondientes.

3. Para el período examinado, el Corredor utilizó el método que requiere que se presente un informe por cada cubierta de seguros de líneas excedentes y que se emita el pago de la contribución sobre primas correspondiente, dentro de un período no mayor de 60 días contado a partir de lo que ocurra primero, la fecha de vigencia de la póliza, la fecha del resguardo provisional o la fecha de confirmación de la cubierta del referido seguro.

4. El Corredor mantiene un procedimiento escrito para la tramitación de negocios de líneas excedentes fechado el 10 de mayo de 1989.

5. El Corredor no sometió a la Oficina del Comisionado de Seguros, el Informe Anual de Primas y Pérdidas de Seguros de Líneas Excedentes para el año 1999.

*872
6. El Corredor no mantenía un registro de los riesgos circulados o expedientes con los modelos de circulación de riesgo, donde constara el curso que siguió cada riesgo. El Corredor no mantuvo un expediente de todos los modelos OCRS (28) enviados por telefax al Centro de Circulación de Riesgos. Además, el Corredor eliminó los modelos de circulación para los años 19996, 1997, 1998 y 2000, y no hay evidencia de que las pólizas fueron expedidas.

7. En 43 casos, el Corredor tramitó una cotización o cursó correspondencia para gestionar la colocación de las pólizas con los aseguradores de líneas excedentes, antes de circular los riesgos o durante el período de circulación.

8. Según refleja la tabla presentada a continuación, el Corredor realizó los pagos de las contribuciones sobre primas de varios de los seguros de líneas excedentes después del término de los sesenta días, contado a partir de la fecha de vigencia de la póliza o del resguardo provisional, o de la fecha de confirmación de cubierta del seguro de líneas excedentes, de estas fechas la que hubiese ocurrido primero.

PUERTO RICAN INSURANCE AGENCY, INC.

Corredor de Líneas Excedentes Casos Pagados sobre Sesenta (60) días Examen Regular al 1/10/1994 -31/12/2000

Número de Informe Asegurados y Años Fecha de Vigencia Fecha de Pago Días Transcurridos 

21 6 Four Seasons Travel, Inc.-1996 01/12/95 20/02/96

23 12 Rita María Ortiz Rodríguez -1998 13/07/96 04/10/96

16 11 García Iñiguez, Inc.-1999 29/05/98 14/08/98

2 4 Programa Ed. de Salud Integral - 2000 01/12/98 03/02/99

38 3 Luz V. Castro 22/10/99 28/01/00

3 4 Programa Ed.de Salud Int. 01/12/99 03/02/00

10 7 Iris Medina Gutiérrez 07/12/99 17/02/00

8 18 Frank Suárez 01/03/00 09/05/00

15 31 Fundación Upens, Inc. 27/05/00 10/08/00

50 36 Caguas Educational T. V., Inc. 01/06/00 19/09/00

38 37 Teleponce Cable T.V., Inc. 29/06/00 05/10/00

30 38 Productores Avícolas de P.R.. Otras: - 2000 06/07/00 05/10/00

3 6* Alfredo Zamora Caraballo 04/12/00 05/02/01

51 9* Corp. Des. Eco. Proy. Com. 08/11/00 01/03/01

*873
10* Acess Solutions, Inc. 08/12/00 06/03/01 28

11* Ángel Sanz 15/12/00 06/03/01 21

9. En tres casos circulados y colocados como seguros de líneas excedentes, se encontró que en las facturas para el cobro de primas a los asegurados, el Corredor hizo un cargo a la prima por concepto de derramas.

10. En varias ocasiones, el Corredor no ofreció a la Oficina del Comisionado de Seguros, toda la información requerida por el Modelo OCSE28(C) o la misma no se sometió en forma clara. Por esta razón, en varias ocasiones, la Oficina del Comisionado de Seguros devolvió al Corredor los formularios de circulación de riesgos OCSR28(c).

11. Saint James Security Services, Inc. pidió la cancelación de su póliza efectivo el 3 de junio de 1999. El Asegurador elegible de líneas excedentes le devolvió la prima al Corredor por $3,607.72 ($4,001.29 - $393.57), mediante cheque 242060, de 4 de enero de 2000. El Corredor le envió a la agencia OCASO Insurance Office of Puerto Rico, productor que le llevó la cuenta al Corredor, el cheque número 003680, por la cantidad de $4,001.29 ($3,607.72 + $393.57 de contribuciones). OCASO le devolvió el cheque al Corredor porque le aplicó un crédito a las pólizas del asegurado en el “Account Current” de PRAICO. Sin embargo, el ‘Account Current” al 1 de diciembre de 1999, que mantenía PRAICO, reveló que en ningún momento se aplicó un crédito a las pólizas del asegurado por la cuantía del cheque antes mencionado.

12. En el caso de la póliza de Zen Spa & Health Studio, el riesgo se circuló el 18 de diciembre de 1998 y la fecha de efectividad de dicha póliza fue el 14 de mayo de 2000. O sea, que transcurrieron 17 meses desde que se circuló el riesgo hasta que se colocó la póliza.”

Como consecuencia de las anteriores determinaciones de hechos, la OCS tomó la decisión que a continuación se transcribe:

“Ordeno a Puerto Rican Insurance Agency, Inc., a que según estipulado tome todas las medidas necesarias para corregir las deficiencias señaladas, y en específico deberá:

1. PREPARAR un Informe Anual de Primas y Pérdidas de Seguros de Líneas Excedentes para el año 1999, y presentarlo a la Oficina del Comisionado de Seguros.

2. PREPARAR Y MANTENER adecuadamente el registro de los modelos OCRS(28) que son sometidos al Centro de Circulación de Riesgos y de toda la información pertinente.

3. ENMENDAR el procedimiento escrito para la tramitación de negocios de líneas excedentes de conformidad con la Carta Normativa Núm. E-N-12-1275-95 ele 9 de enero de 19996, y la enmienda a la Regla XXVIII del Reglamento del Código de Seguros de Puerto Rico.

4. UTILIZAR para renovaciones que comenzaron del 2002 en adelante, el método para la presentación de un informe conteniendo todos los seguros de líneas excedentes colocados durante el año calendario inmediatamente precedente a la fecha de la presentación del informe, junto con el pago global de la contribución sobre primas correspondientes a todos los referidos seguros.

5. CIRCULAR los riesgos que se propone colocar con aseguradores elegibles de líneas excedentes conforme al procedimiento que se establece en la Regla XXVIII vigente del Reglamento del Código de Seguros de Puerto Rico.”

*874 En atención a las infracciones en las que se encontró incurso al Corredor en la presente Resolución, le impongo a éste una multa administrativa por la cantidad de $21,275 que se compone de:

“1. $250 por la violación a la Carta Normativa Núm. E-N-12-1275-95 de 9 de enero de 1996 relacionada a la elección y uso del método de presentación del informe sobre los seguros de líneas excedentes.

2. $250 por la violación al Artículo 5 de la Regla XXVIII del Reglamento del Código de Seguros de Puerto Rico por no haber presentado el Informe Anual de Primas y Pérdidas de Seguros de Líneas Excedentes.

3. $250 por la violación a la Carta Normativa Núm. E-12-1275-95 de 9 de enero de 1996 relacionada al registro y archivo de los modelos de circulación de riesgo.

4. $8,600 por incurrir en 43 ocasiones en violación a los Artículos 1(a) y 2 de la Regla XXVIII del Reglamento del Código de Seguros de Puerto Rico, al gestionar la colocación del riesgo con el asegurador elegible de líneas excedentes, antes de circularlo o durante el período de circulación.

5. $8,925 por incurrir en 16 casos, en un atraso total de 357 días en el pago de la contribución requerida por el Artículo 10.130 del Código de Seguros de Puerto Rico, supra.

6. $1,500por infringir el Artículo 27.160(1) y (2) del Código de Seguros de Puerto Rico, supra.

7. $1,500 por el incumplimiento con el Artículo 1(b) de la Regla XXVIII relacionada a dejar de proveer el modelo de circulación debidamente completado, por no circular el riesgo y por no haber puesto a los aseguradores en la posición de hacer una evaluación adecuada de los riesgos.”

II
Las Cuestiones Planteadas
Inconforme con el anterior dictamen administrativo es que PRIA acude ante nos, planteando que la OCS incidió en lo siguiente:

“Al determinar que PRIA violó los artículos 1 y 2 de la Regla XXVIII del Reglamento del Código de Seguros de Puerto Rico.

Al determinar que PRIA violó el Artículo 10.130 del Código de Seguros de Puerto Rico.

Al otorgar fuerza de regla o reglamento a la Carta Normativa Núm. EN-121275-95 y, por ende, imponer multa administrativa a PRIA por violación a una carta normativa.

Al imponer multas en excesó de los límites establecidos en el Código de Seguros de Puerto Rico.”

III
El Derecho Aplicable y Análisis de las Cuestiones Planteadas
A
Sobre nuestra función revisora de las determinaciones de las agencias administrativas, debemos, de umbral, puntualizar que la misma no es ilimitada, ya que dichas determinaciones merecen consideración y respeto. Comisionado de Seguros v. Prime Life Partners, Inc. (Prime), 161 D.P.R. _ (2004), 2004 J.T.S. 105; *875 Asoc. Vec. H. San Jorge v. Med. Corp., 150 D.P.R. 70, 75 (2000).
La sección 4.5 de Ley de Procedimiento Administrativo Uniforme (L.P.A.U.), 3 L.P.R.A. sec. 2175, establece que las determinaciones de hechos de una agencia administrativa serán sostenidas si las mismas están apoyadas en evidencia sustancial que obre en el expediente administrativo. En cuanto a las conclusiones de derecho que no involucren interpretaciones llevadas a cabo dentro del ámbito de especialización de la agencia, serán revisables en toda su extensión. Comisionado de Seguros v. Prime, supra; T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 81 (1999).
Los procedimientos mediante los cuales una agencia administrativa impone penalidades por violaciones a la ley o reglamentos cuya implantación le ha sido delegada por la Asamblea Legislativa, son actuaciones sujetas a revisión judicial limitada. Comisionado de Seguros v. Prime, supra; Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R. 144 D.P.R. 425, 441 (1997).
La facultad de las agencias administrativas para imponer multas administrativas por la violación a las normas que rigen la actividad bajo su tutela, ha sido reiteradamente validada por los tribunales. Comisionado de Seguros v. Prime, supra; O.E.G. v. Román González, 159 D.P.R. _ (2003), 2003 J.T.S. 74.
La sección 7.1 de la L.P.A.U., 3 L.P.R.A. see. 2201, dispone que las agencias administrativas pueden imponer multas que no excedan de $5,000.00 por cada violación a las leyes que éstas administran; y que en aquellos casos donde la Ley Orgánica de la agencia o alguna ley especial establezca una penalidad mayor a la dispuesta en la sección 7.1, supra, el organismo administrativo está facultado para imponer la sanción mayor.
Nuestro Tribunal Supremo ha reconocido que las agencias administrativas gozan de una amplia discreción en lo referente a la imposición de sanciones, pues son éstas las que diariamente implantan su ley-orgánica y sus reglamentos y las que, por su conocimiento especializado y pericial, están en mejor posición para establecer cuál es el efecto de la violación a lo reglamentado. Comisionado de Seguros v. Prime, supra; E.L.A. v. Frigorífico y Almacén del Turabo, 155 D.P.R. _ (2001), 2001 J.T.S. 125.
En el ejercicio de nuestra facultad revisora de sanciones administrativas, el criterio a aplicar es que siempre que la sanción esté fundamentada en evidencia sustancial, no constituya una actuación ultra vires y tenga una relación razonable con los actos que se quieren prohibir o penalizar, los tribunales debemos brindarles gran deferencia. Comisionado de Seguros v. Prime, supra. Además, dicha revisión judicial no depende, de ordinario, de si el tribunal considera que la sanción es muy fuerte o no. Ello es así porque en la implantación de la ley y en la consecución de sus objetivos, es a la agencia administrativa y no al tribunal a la que le corresponde determinar cuál es la sanción aplicable a los hechos. Comisionado de Seguros v. Prime, supra; O.E.G. v. Román González, supra; Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., supra.
Finalmente, sobre el tema, los tribunales tenemos la obligación de velar porque la sanción administrativa no exceda de lo permitido por ley y porque no constituya un claro abuso de discreción. Comisionado de Seguros v. Prime, supra; Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R. supra.
B
i
Por tratar el presente caso de las actividades de un Corredor de Seguros de Líneas Excedentes, debemos dejar establecido el ámbito funcional de este profesional:

“Corredor” es la persona nombrada por un asegurador para gestionar solicitudes de seguros o negociar seguros en su nombre, y si fuere autorizada para ello por el asegurador, para efectuar y refrendar contratos de 
*876
seguros. Código de Seguros, Artículo 9.020, 26 L.P.R.A. sec. 902. ”

El Código de Seguros define en su Artículo 10.070, 26 L.P.R.A. see. 1007, el “Seguro de Líneas Excedentes” como:

“Cualquier parte o la totalidad de una cubierta de seguro que no pueda obtenerse de aseguradores autorizados, cubierta que en adelante se designará en este título como “seguros de líneas excedentes”, podrá obtenerse de aseguradores no autorizados, siempre que:

(1) El seguro no pueda obtenerse de aseguradores autorizados, o ha sido obtenido hasta el máximo que dichos aseguradores están dispuestos a asegurar; y

(2) dicho seguro se obtenga mediante un corredor autorizado de seguros de líneas excedentes, en adelante llamado en este Capítulo “corredor”; y

(3) el seguro con un asegurador no autorizado no se procure o requiera con el fin de obtener ventajas, bien en cuanto al tipo de primas, o en cuanto a los términos del contrato de seguro, y

(4) el seguro se obtenga de aseguradores no autorizados elegibles con arreglo al Artículo 10071 de esta Ley”. 

ii
A los fines de una exposición ordenada y clara del análisis de las cuestiones planteadas, a continuación discutiremos, en primer lugar, el esquema dispuesto en el Código de Seguros para la imposición de multas administrativas por violaciones a sus disposiciones; y seguidamente, examinaremos las siete (7) infracciones o violaciones por las que fue hallada incurso la recurrente y por las cuales la OCS le impuso multas administrativas. Dentro de éste análisis dispondremos sobre los errores señalados por la recurrente contra las determinaciones de la OCS.
C
Sobre las Multas a imponerse por Violaciones al Código de Seguros v su Reglamentación
El Artículo 9.480 del Código de Seguros, 26 L.P.R.A. see. 948, en lo relativo a la imposición de sanciones a los profesionales de la industria de seguros que violen las disposiciones del Código, establece que:

“(1) En adición a la denegación, revocación o suspensión de la licencia o en lugar de las mismas, a cualquier tenedor de licencia que violare una disposición de este título podrá imponérsele cualquiera de los siguientes castigos:

(a) Denegación de la licencia en cualquier capacidad autorizada con arreglo a este título por un término que no excederá de cinco años.

(b) Multa administrativa que no excederá de quinientos (500) dólares por cada falta; disponiéndose, que el total de multas impuestas por diferentes faltas no excederá de cinco mil (5.000) dólares.

(c) Al ser convicto de dicha violación por sentencia firme de un tribunal, con multa no menor de cincuenta (50) ni mayor de cinco mil (5,000) dólares.

(2) Cualesquiera de dichas penalidades podrán ser en adición a cualquier otra provista por ley”.

*877 (Subrayado nuestro).
A los corredores de seguros de líneas excedentes le son aplicables las disposiciones de los Capítulos IX y X del Código de Seguros, referentes a corredores y aseguradores no autorizados, respectivamente. El Artículo 9.480(l)(b) del Código, 26 L.P.R.A. see. 948, establece que a aquel corredor que infrinja alguna disposición del Código, podrá imponérsele una multa administrativa que no excederá de $500.00 por cada falta. A renglón seguido, dicho artículo claramente dispone que “el total de multas impuestas por diferentes faltas no excederá de cinco mil (5,000) dólares. ”
Por excepción, las violaciones al Artículo 10.130 del Código de Seguros, 26 L.P.R.A. see. 1013, conforme al siguiente Artículo 10.131, 26 L.P.R.A. sec. 1013a, se sancionan con una penalidad distinta a la dispuesta en el antes citado Artículo 9.480 (l)(b).
El Artículo 10.130, supra, establece la obligación a los corredores de líneas excedentes de pagar al Secretario de Hacienda una contribución equivalente al nueve por ciento (9%) de la prima total cobrada. Se trata de una obligación contributiva para la cual, el Artículo 10.131, supra, impone una penalidad distinta, que consiste de una multa de veinticinco (25) dólares por cada día de atraso. Esta diferencia en este tipo de sanción administrativa responde al interés del Estado de evitar la evasión contributiva. Comisionado de Seguros v. Prime Life Partners, Inc., supra.
D
1
Violación a la Carta Normativa Núm. E-N-12-1275-95. Relacionada con la Elección v Uso del Método de Presentación del Informe Sobre los Seguros de Líneas Excedentes
El 9 de enero de 1996, la OCS emitió la Carta Normativa Núm. E-N-12-1275-95. Dicha carta estableció un nuevo procedimiento para la circulación de riesgos que se deseen colocar como seguros de líneas excedentes y para el pago de la contribución sobre primas correspondientes. En lo pertinente a Ja infracción imputada a PRIA, dispone dicha orden o directriz lo siguiente:

“En cuanto a la enmienda relacionada con la presentación del informe y el pago de la contribución sobre primas, la Regla contempla dos alternativas.

Una de ellas es la que provee el Código de Seguros de Puerto Rico, la cual establece que para cada cubierta de seguros de líneas excedentes el corredor presentará el informe y el pago de la contribución sobre primas correspondiente dentro de un período no mayor de sesenta (60) días, contado a partir de la fecha de vigencia de la póliza o del resguardo provisional del seguro de líneas excedentes, o de la fecha de confirmación de la cubierta del referido seguro, de estas dos fechas, la que ocurra primero. Además de este informe, se requiere la presentación de un informe anual consolidado de primas y pérdidas.

La Regla permite una segunda alternativa: la presentación de un informe que contenga todos los seguros de líneas excedentes colocados durante el año calendario inmediatamente precedente a la fecha de presentación del informe, junto con el pago global de la contribución sobre primas correspondientes a todos los referidos seguros. Se presentará dicho informe dentro de los sesenta (60) días siguientes a la terminación del año calendario al que se refiere aquél.

Para esta segunda alternativa, el Corredor deberá mantener vigente una fianza de garantía financiera o un certificado de depósito, cedido fiduciariamente al Secretario de Hacienda, equivalente al 10% del total de las primas de seguros de líneas excedentes gestionadas por el Corredor durante el año calendario anterior o 
*878
$25,000, lo que sea mayor. Tanto la fianza como el depósito deberán cumplir con el Artículo 3(c) de la Regla.

Es importante aclarar que la fianza aue aquí se menciona es una distinta a la fianza requerida al Corredor vor el Artículo 10.110(3) del Códiso de Seguros de Puerto Rico. Por lo tanto, el Corredor que opte por acogerse al método de presentar el informe y pagar la contribución sobre primas sobre una base anual deberá mantener, además de la fianza o el certificado que requiere la Regla, la fianza requerida por el Artículo 10.110(3)

Se acompaña con esta carta copia de los modelos OCSR28(I) y OCSR28(IA), diseñados por esta Oficina para la presentación del informe y el pago de la contribución sobre primas, para cada una de las alternativas antes descritas. El modelo que se identifica como OCSR28(I) corresponde a la presentación del informe para cada cubierta de seguro de líneas excedentes, mientras que el modelo que se identifica como OCSR28 (IA) corresponde a la presentación del informe anual de todos los seguros de líneas excedentes.

Cada Corredor deberá, dentro de un término de treinta (30) días contados a partir de la fecha de esta carta, informar al Comisionado el método que adoptará para la presentación del informe y el pago de la contribución. Después de adovtar cualquiera de los métodos, el Corredor no vodrá cambiarlo sin dar aviso al Comisionado con treinta (30) días de antelación al cambio.” (Subrayado nuestro).
A pesar de que PRIA optó por utilizar la segunda alternativa para el pago de contribuciones sobre primas, de las ofrecidas en la Carta Normativa, o sea, la presentación de un informe contentivo de todos los seguros de líneas .excedentes colocados durante el año calendario inmediatamente precedente a la fecha del informe junto con el pago global de la contribución sobre primas correspondientes, sin dar aviso a la OCS optó luego por utilizar el método que requiere la presentación de un infórme por cada póliza. Este método requiere que el informe y el pago de la contribución se haga dentro de un período no mayor de 60 días, contado a partir de la fecha de vigencia de la póliza o del resguardo provisional, o de la fecha de confirmación de cubierta del seguro, cualesquiera de las dos fechas que ocurra primero. PRIA aceptó que dicha situación ocurrió.
Del expediente administrativo ante nos surge que la falta se cometió y, por ende, procedía la imposición de multa. Se le impuso una multa a la recurrente de $250.00.
2
Violación a la Carta Normativa Núm. E-N-12-1275-95 Relacionada con el Registro y Archivo de Modelos de Circulación de Riesgos
Sobre el mantenimiento de un registro de los riesgos circulados, y los expedientes con los modelos de circulación de riesgos, de donde se desprende el decurso que siguió cada riesgo, la CN, supra, en lo pertinente dispone lo siguiente:

“Uno de los principales cambios es el establecimiento de un centro de circulación de riesgos (“el Centro”), administrado por esta Oficina, que el corredor de líneas excedentes (“el Corredor”) deberá utilizar para ofrecer el riesgo que se propone colocar como tal. Para dar cumplimiento a lo anterior, esta oficina ha establecido el siguiente procedimiento:

1. El Corredor deberá proveer toda la información que requiere el Modelo OCSR28(C), copia incluida, y enviarlo por telefax al Centro a través de los siguientes teléfonos: 729-0097y 729-0098.

2. El Corredor podrá considerar que se rechazó el riesgo si no recibe contestación por escrito al referido modelo dentro de los cinco (5) días laborables contados a partir de la fecha en que el Centro recibió el modelo para hacer la circulación.

*879
La información provista en el Modelo OCSR28(C) debe estar completa, especialmente en cuanto a la descripción del riesgo, la clase de seguro que se intenta obtener y la cantidad o los límites del seguro. Sobre este particular, deberán referirse específicamente al Artículo 1(b) de la Regla.

Si la información provista por el Corredor no es suficiente o no está completa, se devolverá el referido modelo al Corredor. En, este caso, el término de cinco (5) días laborables antes mencionado empezará a correr cuando el Corredor someta dicho modelo con la información completa.

3. El Corredor deberá mantener un expediente de todos los modelos enviados por telefax al Centro y vrevarará un reeistro donde conste qué curso sieuió cada riesso: es decir, si se colocó en el mercado autorizado, o en el mercado de líneas excedentes. Dicho reeistro deberá incluir, además, el nombre del aseeurador que asesuró el riesso. el número de notizM. resguardo o nota de cubierta, el por ciento de varticivación del aseeurador. si es un sindicato o eruiió él que aseéura el rieseo. v el nombre del aseeurado.
En los casos en que coloque el riesgo con aseguradores de líneas excedentes, se deberá mantener copia del modelo OCSR28(c) en el expediente de la póliza correspondiente”. (Subrayado nuestro).
Frente a este señalamiento, PRIA planteó no tener la evidencia sobre el registro y archivo de modelos de circulación de riesgos porque al no emitir póliza alguna, anualmente eliminaba dichos modelos. Para la OCS esta explicación fue insatisfactoria. Coincidimos. También procedía la imposición de multa. Se impuso una multa de $250.00.
3
Validez Legal de la Carta Normativa Núm. E-N-12-1275-95
En su tercer señalamiento de error, PRIA plantea que erró la OCS al otorgar fuerza de regla o reglamentos a la citada carta normativa y, por ende, imponerle una muíta administrativa a base de dicha carta normativa.
El Artículo 9.460(b) del Código de Seguros, 26 L.P.R.A. see. 946 (b), establece lo siguiente:

“El Comisionado podrá denegar, suspender, revocar o negarse a renovar una licencia expedida con arreglo a este capítulo, la de corredor de seguros de líneas excedentes, o la de agente general, por cualquier causa especificada en las disposiciones de este título por cualquiera de los siguientes motivos

(a)...

(b) Por violar intencionalmente, dejar de cumplir o participar a sabiendas en la violación de cualquier disposición de este título, o de cualquier regla, reglamento u orden lesal del Comisionado...”. (Subrayado nuestro)
Lo dispuesto en el anterior citado artículo demuestra que el legislador autorizó al Comisionado de Seguros a imponer sanciones administrativas a cualquier persona que viole intencionalmente no tan sólo disposiciones del Código de Seguros o de su reglamento, sino al que violare cualquier orden legal del Comisionado. Un examen de la Carta Normativa Núm. E-N-12-1275-95 nos permite concluir que su contenido trata de una orden legalmente dada por la OCS. 
Por tanto, el tercer error señalado por la recurrente no se cometió.
Las multas impuestas por violación a la Carta Normativa, $250.00, en lo relacionado con la elección y uso del método de presentación del informe sobre los seguros de líneas excedentes; y de $250.00 por nó haber *880 presentado oportunamente el Informe Anual de Primas y Pérdidas de Seguros de Líneas Excedentes, se ajustaron individualmente a lo permitido por el Artículo 9.480 del Código de Seguros, supra.
E
Violación al Artículo 5 de la Regla XXVIII del Reglamento del Código de Seguros por no haber Presentado el Informe Anual de Primas y Pérdidas para 1999
Sobre la presentación de informes requeridos por la OCS a los corredores de seguros excedentes, el Artículo 3 del Reglamento XXVHI dispone lo siguiente:

“El corredor de seguros de líneas excedentes presentará el informe y el pago de la contribución sobre primas de seguros de líneas excedentes requeridos respectivamente por los Artículos 10.080 y 10.130 del Código de Seguros de Puerto Rico en el modelo diseñado por la Oficina del Comisionado de Seguros, para lo cual utilizará uno de los siguientes métodos:

(i) Presentar el informe y el pago de la contribución para cada cubierta de seguros de líneas excedentes obtenida dentro de un período no mayor de sesenta (60) días, contado a partir de la fecha de vigencia de la póliza o del resguardo provisional, o de la fecha de confirmación de cubierta del seguro de líneas excedentes, de estas dos fechas la que ocurra primero, o...”

(ii) Presentar un informe anual, dentro de los sesenta (60) días siguientes a la terminación de cada año calendario, contentivo de todas las cubiertas de seguros de líneas excedentes obtenidas durante el año calendario inmediatamente precedente a la presentación del informe. Este informe incluirá el pago de contribución sobre primas correspondiente a todas las cubiertas colocadas como seguro de líneas excedentes durante dicho año calendario.

(b) El corredor de seguros de líneas excedentes informará al Comisionado de Seguros, previo a su utilización, el método que ha de utilizar para la presentación del informe y el pago de la contribución sobre primas al que se refiere el apartado (a) de este Artículo.

Si el corredor de seguros de líneas excedentes escogiera presentar su informe y efectuar el pago de la contribución sobre primas anualmente deberá mantener vigente una fianza de garantía financiera o un certificado de depósito, cedido fiduciariamente al Secretario de Hacienda de Puerto Rico, para responder por el pago a tiempo de la referida contribución. Ea garantía aquí requerida, sea la fianza o el certificado, deberá ser equivalente al 10% del total de primas correspondientes a los seguros de líneas excedentes gestionados por el corredor de seguros de líneas excedentes durante el año calendario anterior, pero nunca será menor de $25,000...”
Los siguientes artículos 5 y 6 establecen los términos para la presentación de un Informe Anual y las penalidades en caso de incumplimiento, al disponer lo siguiente:

“Artículo 5. Informe Anual

Dentro de los sesenta (60) días siguientes a la terminación de cada año calendario, todo corredor de seguros de líneas excedentes rendirá el informe de pérdidas requerido por el Artículo 10.140(3) del Código de Seguros de Puerto Rico en los modelos que el Comisionado de Seguros diseñe para este propósito. En aquellos casos en que no haya habido transacción alguna, se rendirá el informe haciendo una indicación al efecto.

*881
Artículo 6. Penalidades

Si un corredor de seguros de líneas excedentes no cumpliere con el procedimiento establecido por esta Regla para la circulación de los riesgos, el Comisionado de Seguros, además de cualquier otra penalidad dispuesta en el Códigó dé Seguros de Puerto Rico, le suspenderá su licencia de corredor de seguros de líneas excedentes”.

El Artículo 10.131 del Código de Seguros, 26 L.P.R.A. sec. 10-13a, especifica que:

“Todo corredor de líneas excedentes que dejare de presentar su informe sobre la cubierta de seguro de líneas excedentes y dejare de pagar la contribución especificada dentro del término establecido en el Artículo 10.130, estará sujeto a una multa administrativa de veinticinco (25) dólares por cada día de atraso, sujeto al derecho del Comisionado de conceder una prórroga ráiónable para presentación y pago.”

Ante los requerimientos de la OCS, PRIA no pudo producir copia del Informe Anual de Primas y Pérdidas de Seguros de Líneas Excedentes para el Año 1999, a pesar de que insistió en que había radicado dicho informe. Optó por proponer radicado nuevamente. A todas luces, fue correctá la conclusión de la OCS en cuanto a que PRIA incumplió con dicha reglamentación. Procedía la imposición de multa ante dicho incumplimiento. Se le informó una multa de $250.00.
F
Violación a los Artículos Na) y 2 de la Regla XXVIII del Código de Seguros. al Gestionar la Colocación del Riesgo con el Asegurador Elegible de Líneas Excedentes antes de Circularlo o Durante el Período de Circulación
En lo pertinente al caso de autos, el Artículo 2 de la Regla XXVIII, supra, sobre la Circulación de Riesgos, dispone lo siguiente:
“El corredor de seeuros de líneas éxcedentes no podrá colocar el riesgo como sesuro de líneas excedentes hasta que el mismo sea rechazado por los aseguradores entre quienes se circuló éste. El corredor de seguros de líneas excedentes podrá considerar que se ha rechazado el riesgo, si no recibe contestación de dichos aseguradores dentro de cinco (5) días laborables a partir de la fecha en que el centro de circulación de riesgos recibió el modelo para hacer la correspondiente circulación.” (Subrayado nuestro).
Sobre este señalamiento, PRIA aceptó que cursó correspondencia previa la circulación del riesgo. Sostuvo que dichas comunicaciones no constituyeron violación a la norma. Que la correspondencia cursada con el asegurador fue a fin de meramente informar y advertir el vencimiento de la póliza, pero negó que ello constituyera una práctica de solicitación, de persuasión o de negociación anterior a la circulación del riesgo.
La OCS concluyó que en 43 ocasiones, PRIA incurrió en dicha práctica, por lo que violó el Artículo 2 de la Regla XXVm. No hemos encontrado nada en el expediente administrativo que nos mueva a variar la conclusión de que tal actuación constituye parte del acto de colocación del riesgo previo a su circulación.
Procedía la imposición de multa. La OCS impuso una multa de $200.00 por cada violación, para un total de $8,600.00. Conforme a lo dispuesto en el Artículo 9.480, supra, según más adelante explicado, esta multa debe ser modificada.
G
Violaciones por Atrasos en el Pago de la Contribución Requerida por el Artículo 10.130 del Código de Seguros
*882 PRIA objetó este señalamiento. Dicha objeción carece de méritos. El Artículo 10.130 del Código de Seguros, 26 L.P.R.A. see. 1013, en lo relevante a este asunto dispone lo siguiente:

“(1) Se impone sobre cada cubierta de seguro de líneas excedentes otorgada en Puerto Rico o que cubriere riesgos residentes, ubicados o a ejecutarse en Puerto Rico, dondequiera se hubiere negociado, una contribución igual al nueve (9) por ciento de la prima total cobrada por concepto de la misma, excluyendo la contribución, excepto cubiertas dirigidas a cubrir el riesgo de impericia profesional médico-hospitalaria. El corredor será responsable del cobro y pago de la contribución.

(2) Dentro de sesenta días después de obtenida una cubierta de sesuro de líneas excedentes, el Corredor deberá presentar al Comisionado un informe de la misma vara fines contributivos, expresando los nombres v direcciones del asegurador v del asegurado, él número de la póliza v la fecha de expedición, la cantidad recibida por concepto de prima v el cómvuto e importe de la contribución adeudada. El informe deberá acompañarse de cheque certificado oasadero al Secretario de Hacienda por el importe de la contribución a pasarse por concepto de la cubierta informada.
(3) El asegurador de seguros de líneas excedentes y dicha prima no estarán sujetos al pago de ninguna otra contribución con arreglo a este código que no sea la que se prescribe en este artículo.” (Subrayado nuestro).
Durante la investigación de la OCS, y a tenor con la resolución de la cual se recurre -basada en la prueba documental, estipulaciones y argumentaciones presentadas por las partes-, PRIA, en 16 ocasiones, realizó el pago de la contribución fuera del término de 60 días. En total, sus atrasos sumaron 357 días. Conforme al Artículo 10.131 del Código de Seguros, infra, procedía la imposición de una multa de $25.00 por cada día de atraso. La totalidad de la multa impuesta, de $8,925, se hizo conforme a la ley.
Debemos tener presente que en Comisionado de Seguros v. Prime Life Partners, Inc., supra, caso resuelto el pasado 28 de junio de 2004, el Tribunal Supremo enunció que a la-luz de lo dispuesto en el Artículo 10.131, supra, en estos casos es el Comisionado el único que puede conceder una prórroga razonable para la presentación del informe contributivo y para efectuar el pago, por lo que cuando no se concede dicha prórroga procede la imposición de la multa de $25.00 dólares por cada día de atraso en el pago de las contribuciones.
Por lo tanto, el segundo error señalado por PRIA tampoco se cometió. La multa fijada por la suma de $8,925.00, a razón de $25.00 por cada día de atraso (357 días), se ajustó a lo dispuesto en el Artículo 10.131, supra, del Código de Seguros.
H
Infracción al Artículo 27.160 (1) v (2) del Código de Seguros. sobre el Tráfico Ilegal de Primas
El Artículo 27.160 del Código de Seguros, 26 L.P.R.A. see. 2716, sobre el tráfico ilegal de primas, establece en lo aquí pertinente que:

“(1) Ninguna persona voluntariamente cobrará ninguna cantidad como prima o cargo por un seguro que no haya sido ya provista o que no esté en vías de proveerse (sujeto a la aceptación del riesgo por el asegurador) mediante una póliza de seguro expedida por un asegurador, según se autoriza en este título.

(2) Ninguna persona, voluntariamente, cobrará como prima o cargo por seguro suma alguna en exceso de la cantidad realmente gastada o en vías de gastarse para el seguro aplicable al objeto por el cual se ha cobrado o cargado dicha prima.

*883
(3)...

99

La OCS determinó que PRIA había violado estas disposiciones en tres ocasiones cuando hizo cargos a la prima por concepto de derramas. PRIA aceptó esta situación ante la OCS, pero adujo como defensa que había devuelto el dinero.
La OCS le impuso una multa de $500.00 por cada falta, para un total de $1,500.00.
I
Incumplimiento con el Artículo 1(b) de la Regla XXVIII del Reglamento del Código de Seguros, por dejar de Proveer el Modelo de Circulación Debidamente Completado, por no Circular el Riesgo v por no Haber Puesto a los Aseguradores en la Posición de Hacer una Evaluación Adecuada de los Rieseos
La circulación de riesgos previo a la obtención del seguro es función ineludible del corredor de seguros de líneas excedentes. Sobre los mecanismos autorizados para la circulación de riesgos, el Artículo 1 de la Regla XXVIII del Reglamento del Código de Seguros establece lo siguiente:
“(a) Todo corredor de seguros de líneas excedentes, previo a la colocación de un seguro de esta clase, deberá ofrecer el riesgo que se propone colocar como tal en el modelo diseñado por la Oficina del Comisionado de Seguros para este propósito. El corredor de seeuros de líneas excedentes hará dicha oferta de seeuros utilizando el centro de circulación de rieseos que vara este propósito establecerá v administrará la Oficina del Comisionado de Seeuros.
(b) Se entenderá que el corredor de seeuros de líneas excedentes no ha cumplido con su obligación de ofrecer el rieseo vara su colocación si no provee toda la información requerida en el modelo antes mencionado o si la información provista es incorrecta, ambigua, vasa, o no colocaría a los aseguradores entre los que se circulará el rieseo en posición de hacer una evaluación adecuada del mismo.

(c) En la administración del centro de circulación de riesgos, el Comisionado de Seguros vendrá obligado a:

(i) Circular el riesgo entre un nümero significativo de aseguradores autorizados o sus representantes en Puerto Rico de por lo menos veinte (20) aseguradores.

(ii) Utilizar aseguradores que normalmente suscriban la clase de seguro a la cual pertenece el riesgo que se va a circular.

(iii) Alternar las circulaciones entre el mayor número de aseguradores hábiles con el propósito de impedir que se restrinjan las mismas a un número limitado de aseguradores.” (Subrayado nuestro).
La OCS concluyó que PRIA no le proveyó el modelo de circulación debidamente completado, que no circuló el riesgo y que no puso los aseguradores en posición de hacer una evaluación de los riesgos a asegurar.
Este señalamiento fue contestado por PRIA aduciendo que en los casos donde se dio esa situación, se enviaron los formularios correspondientes a la OCS enmendados. Esto conlleva una aceptación de dicho señalamiento, por lo que la OCS le impuso una multa de $1,500.00.
*884 J
Modificación de las Multas Impuestas
Aunque el dictamen de la OCS en la resolución recurrida, en cuanto a sus determinaciones de hechos y conclusiones de derecho, está apoyado por la evidencia sustancial que obra en el expediente administrativo, ciertas multas impuestas a la recurrente se excedieron de los límites establecidos en el Código de Seguros. Veamos.
La multa de $8.925.00 por la violación al Artículo 10.130, supra, computada a razón de $25.00 por cada día de atraso en el pago de la contribución requerida por dicho artículo, se ajustó a la penalidad establecida por el legislador en el Artículo 10.131, supra.
Sin embargo, el conjunto de multas impuestas por las otras violaciones determinadas por la OCS tiene que ser modificado para atemperarlas a lo dispuesto en el Artículo 9.480, supra. Tiene que ser así, porque el total de multas por diferentes faltas o violaciones no puede exceder de $5,000.00. Así la norma, para las demás faltas en que fue hallada incurso la recurrente, procedemos a reducir las multas a una suma global de $5,000.00.
IV
Disposición del Recurso
Por los fundamentos antes expuestos, se confirma la resolución de la Oficina del Comisionado de Seguros, modificándola en cuanto a la cuantía de las multas impuestas. Se sostiene la multa de $8,925.00 por las violaciones al Artículo 10.130 del Código de Seguros, supra, pero se reducen las multas para las demás violaciones a la suma global de $5,000.00; para un total $13,925.00 por concepto de multas.
Notifíquese.
Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones
ESCOLIOS 2005 DTA 25
1. Su relación con el señalamiento de que PRTA “cursó correspondencia con el asegurador elegible de líneas excedentes antes de circular los riesgo, o antes de transcurrir el período de cinco (5) días establecido, contrario a lo dispuesto en los Artículos 1 y 2 de la Regla XXVIII del Reglamento de Código de Seguros”.
2. Los días transcurridos para varios de los informes se modificaron con el propósito de que reflejaran las situaciones en que la fecha de vencimiento del pago vencía sábado, domingo o días feriados. Estos informes son los siguientes: 11-1998, 4-1999, 4-2000, 7-2000, 18-2000, 38-2000, 9-2000. Además es menester señalar que se corrigió el error tipográfico en la fecha de pago del informe 11-1998. También, se corrigió la transposición de la fecha de vigencia del informe 6-19996. Por último, ya que las fechas presentadas en el informe 9-2000 no cuadraban con el número de días transcurridos según presentado en la tabla, se dejaron las fechas presentadas y se modificó la partida de días transcurridos.
3. Mediante las leyes número 47 de 4 de marzo de 2002 y número 284 de 19 de diciembre de 2002, este artículo sufrió algunas enmiendas, las cuales no son de aplicación al presente caso por tratarse de actividades correspondientes al período comprendido entre el 1ro. de octubre de 1994 y 31 de octubre de 2000.
4. Véase que la propia Carta Normativa Núm. E-N-12-1275-95 establece que después de adoptar cualquiera de los métodos, él corredor no podrá cambiarlo sin dar aviso previo al Comisionado de Seguros. Del expediente administrativo no surge evidencia de que PRIA así lo haya hecho.
*885 5. El texto y contenido de la Carta Normativa en cuestión es infra vires para la OCS.